UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-cr-00154-wks-1 |
| | ) | |
| JAMES COYNE, | ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION TO STRIKE
### and
### REPLY IN SUPPORT OF MOTION TO
### SUPPRESS EVIDENCE AND STATEMENTS

Now Comes James Coyne, by counsel, and files this motion to strike and reply to the government's opposition to his Motion to Suppress Evidence and Statements. To begin with, the Court should reject the government's efforts to evade the page limits set by this Court and incorporate into its briefing two separate briefs filed as part of the appellate proceedings in *United States v. Ackerman*, 831 F.3d 1292, (10th Cir. 2016).

In his reply, Mr. Coyne notes that numerous important factual issues remain unresolved and that a hearing will be necessary to resolve these issues. Mr. Coyne also explains that the government's claim that Supreme Court and Second Circuit precedent weigh against Mr. Coyne's argument that the National Center for Missing and Exploited Children ("NCMEC") is a governmental entity relies on a cramped reading of these cases. Mr. Coyne further notes that the government's claim that NCMEC and Microsoft did not act as government agents ignores the

[1]

Supreme Court's decision in *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 615 (1989). Finally, Mr. Coyne explains that the private-search and third-party doctrines will not apply in this case. Given the many unresolved factual issues, Mr. Coyne respectfully requests the opportunity to submit supplemental briefing following any evidentiary hearing held by the Court.

## I. Defendant's motion to strike briefs filed as exhibits 6 and 7 to the government's opposition.

Mr. Coyne moves, pursuant to Federal Rule of Civil Procedure 12(f) and Local Criminal Rule 1(b), to strike exhibits 6 and 7 to the government's objections.[1] The government's opposition states that "[i]n opposing Coyne's claim that NCMEC is a government entity/agent, the government relies on, and incorporates, the in-depth arguments advanced in the Amicus Brief for NCMEC filed in *Ackerman* (with its addendum), Exhibit 6, and on the United States' brief in support of Petition for Panel Rehearing in *Ackerman*, Exhibit 7." Doc. 30 at 17 n.9. The Court should strike these exhibits for several reasons.

First, the government's opposition already runs to 30 pages. With exhibits 6 (48 pages) and 7 (23 pages), the opposition approaches 100 pages. The government did not seek leave to exceed the page limits specified by Local Civil Rule 7(a)(4), made applicable by Local Criminal Rule 1(b). The Court should not sanction such an effort to evade the page-limits specified by the local rules.

Second, the NCMEC brief (doc. 30-6) that the government now offers was rejected in *United States v. Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016).

---

[1] Rule 12(f)(2) permits a court to strike material "on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."

[2]

Writing for the court, now-Justice Gorsuch explained that it would not consider arguments the parties themselves chose to forgo:

> [O]urs is a party-directed adversarial system and we normally limit ourselves to the arguments the parties before us choose to present. Amici briefs often serve valuable functions, but those functions don't include presenting arguments forgone by the parties themselves or effectively and unilaterally expanding the word limits established by rule for a favored party.  Indeed, for just these reasons (and more) this court has routinely declined to consider arguments presented only in an amicus brief—and no one even attempts to offer us a reason to depart from that practice here.

*Id.*  The same should be true here.  To the extent the government has chosen not to address issues or raise arguments in its own 30-page brief, the Court should not permit the government to raise these arguments through briefs filed in other cases by entities that are not party to these proceedings.

Third, unlike in *Ackerman*, NCMEC has not even sought permission to appear or intervene as an amicus.  To the extent that NCMEC seeks to have its views heard, it should utilize the procedures already in place to appear as an amicus and Mr. Coyne should have the opportunity to meet that request.  For these reasons, Mr. Coyne respectfully requests that the Court grant his motion to strike.  Should the Court deny his motion, Mr. Coyne seeks leave to submit a response to the arguments raised in these exhibits.

## II.   A hearing is required to resolve disputed factual issues.

The government's opposition makes it clear that a hearing is required to resolve disputed factual questions.  For example, in its response, the government and Microsoft acknowledge that the images were identified using the company's

PhotoDNA technology. Both also assert that the images were individually reviewed by the company. Opp. at 1. Yet, this is in contrast to other statements made by the company in which it has said that the identification and reporting of images is automated. *See Help stop the spread of child exploitation images and protect your business*, (available at https://www.microsoft.com/en-us/photodna (last accessed May 12, 2017) ("If a match is found, the images are automatically flagged for reporting to the appropriate authorities."); Tracy Ith, *Microsoft's PhotoDNA: Protecting children and businesses in the cloud* (available at https://news.microsoft.com/features/microsofts-photodna-protecting-children-and-businesses-in-the-cloud/#1mLc4xhgvZIIVj3t.97 (last accessed May 12, 2017) ("PhotoDNA allows [the ISP] to identify known illegal images among a much greater number of photos, while in many cases letting human moderators avoid the disturbing task of identifying them.")).

In addition, the government characterizes Mr. Coyne's arguments as "specious" and states that "Microsoft does not monitor its: networks 'based on parameters provided by the government'" as Mr. Coyne has argued. Opp. at 20. This categorical claim ignores Microsoft's own statement that it is NCMEC that provides the list of images (or set of hashes) that Microsoft searches for: "The hash set is created by NCMEC and derived from the 'worst of the worst' child pornography images uploaded to the CyberTipline by electronic service providers." *Help stop the spread of child exploitation images and protect your business*, (available at https://www.microsoft.com/en-us/photodna (last accessed May 12, 2017)). If

[4]

NCMEC is a governmental entity, as the Tenth Circuit concluded, Mr. Coyne's argument is not specious, it is accurate based on Microsoft's own statements.

Moreover, while the government has submitted an affidavit by Jeff Lilleskare, a Microsoft employee, that affidavit says no more than that, upon review of the NCMEC form, it appears the box for "reviewed by company" was checked. Doc. 30-2 at 1. The government has not identified who from Microsoft reviewed the images or sought any statement from that individual that the images were in fact viewed. In short, these and other factual issues are unresolved and a hearing is required at which testimony can be taken and evidence received by the Court.

### III. The government's claim that NCMEC is not a governmental entity relies on a narrow reading of Supreme Court and Second Circuit decisions.

The government offers that NCMEC is not a governmental entity because it does not satisfy the three-part test adopted by the Second Circuit in *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 83-84 (2d Cir. 2000), based on *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995). Principally, the government urges that NCMEC is not a governmental entity because the NCMEC board is not controlled or dominated by individuals appointed by the government. Opp. at 19 ("the Second Circuit has decided that [*Lebron*] 'mean[s] what it says'– and it says that an entity is not a government component unless it is created, and majority-controlled, by the government."). This is an oversimplification and ignores the fact that the government may control an organization through means other than its governing board.

To begin with, the Second Circuit's decision in *Hack* did not turn solely on the makeup of the Yale governing board.  Instead, the *Hack* Court looked beyond the makeup of the board to whether the government actually exercised any meaningful control of Yale.  The court did not find any meaningful governmental control and explained that "[i]t is equally clear that the state could not control Yale's policies and operations even if it chose to become involved.  Yale, as a private university, did not act under color of law."  *Hack*, 237 F.3d at 84.  Several years later, the Second Circuit made it clear that no one test controlled the inquiry and explained that "'there is no single test to identify state actions and state actors.'  Rather, there are 'a host of facts that can bear on the fairness of . . . an attribution' of a challenged action to the State."  *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004) (quoting *Brentwood Academy v. Tennessee School Athletic Ass'n.*, 531 U.S. 288, 294 and 296 (2001)); *see also United States v. Silva*, 554 F.3d 13, 18 (1st Cir. 2009) (identifying "three factors as potentially relevant in deciding whether a private party acts as a government agent: 'the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests.'" (citation omitted)).[2]

---

[2] *See also Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 552 (2d Cir. 2001) (explaining that there are "a 'host of facts' that can bear on whether an activity may be attributable to the state: when the state exercises its coercive power or significant encouragement, when a private actor is a willful participant in joint activity with the state, when an entity is controlled by the state or an agency thereof, when an entity has been delegated a public function by the state, when an actor is entwined with governmental policies, or when the government is entwined in the entity's management or control.").

*Horvath* involved a civil rights suit filed against the Westport Library Association.  Although the provision of library services is not "a function traditionally associated with sovereignty," *id.* at 152 (citation, quotations omitted), the Second Circuit still found that Westport Library Association was a governmental entity.  Notwithstanding the makeup of the board, in *Horvath*, it was several other factors that convinced the Second Circuit that the library was a governmental actor:  the library had been "created by a special act of the Connecticut State legislature"; "the provision of library services is a legitimate statutory objective"; and "only a little more than a tenth of the Library's funding comes from sources other than the Town." *Id.* at 153.  The Second Circuit observed that these factors together "convince[] us that the Town maintains sufficient control over the Library to qualify it as a state actor for the purposes of Horvath's claim." *Id*.  That the makeup of an organization's governing board is not necessarily decisive is further evident in another Second Circuit decision, *Gorman-Baker v. Cornell Coop Extension of Schenectady County*, 252 F.3d 545 (2d Cir. 2001).  In *Gorman-Baker*, the Second Circuit concluded the organization was a state actor although only two of ten board members were required to be government officials. *Id.* at 552-553 (concluding at 553 that "the Cooperative was created pursuant to state law to carry out county, state and federal educational functions; is funded by federal, state and county governments; is subject to significant oversight by Cornell University as an agent of the state; and is defined in state law as a subordinate governmental agency.  We suggest that these factors, demonstrating that the

[7]

Cooperative is a creature of the state which voluntarily carries out state functions with state encouragement, indicate that the Cooperative is a state actor for purposes of the First Amendment."). In short, the Second Circuit has not required that an organization's governing board actually be controlled by government personnel and has instead considered the level of control exercised by the government. The Tenth Circuit's decision in *Ackerman* is consistent with this approach.

As explained in Mr. Coyne's motion and in *Ackerman*, NCMEC is an organization to which Congress has afforded "many unique law enforcement powers" by virtue of the statutes governing its operations:

> Much as Amtrak was created by statute to assume functions previously carried out by private railroads, Congress passed statutes to fund and mandate various of NCMEC's functions soon after private parties incorporated it. Today, NCMEC is statutorily required to perform over a dozen separate functions, a fact that evinces the sort of "day-to-day" statutory control over its operations that the Court found tellingly present in the Amtrak cases. Law enforcement agents participate at varying levels in its daily operations, and government officials enjoy a sizeable presence on its board. As much as 75 percent of its budget (excluding in-kind donations) comes from the federal government. Neither is there any question about the public benefit NCMEC confers, for by all accounts its important work is essential to the identification and prevention of child sexual exploitation crimes. Congress and NCMEC alike have expressly said as much. Given all this and as a matter of analogistic reasoning, it's difficult to see how a quasi-public corporation like Amtrak (a mere utility, really) might qualify as a governmental entity while NCMEC, an entity afforded so many unique law enforcement powers, might not.

*Ackerman*, 831 F.3d at 1297–98. The *Ackerman* Court's decision is well grounded in Supreme Court precedent and is consistent with the approach taken by the

Second Circuit.  Accordingly, the Court should reject any argument that NCMEC is not a governmental entity.

> IV. Any claim that NCMEC or Microsoft is not a governmental agent ignores *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989).

The government argues that Microsoft is not a governmental agent.  Yet, this argument (and the government's opposition) entirely ignores the Supreme Court's decision in *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 615 (1989) (holding that drug testing was not a private search in light of pervasive regulatory scheme where the "Government has removed all legal barriers to the testing . . . and indeed has made plain not only its strong preference for testing, but also its desire to share the fruits of such intrusions").  The *Ackerman* Court aptly recognized *Skinner*'s relevance and explained that the result in that case bolstered its confidence in its conclusion that NCMEC and the ESP were at least governmental agents.  The court observed that in *Skinner*:

> [T]he Federal Railroad Administration promulgated regulations requiring private railroads to test certain of their employees for illicit drugs and authorizing (but not requiring) railroads to test certain other of their employees.  The government acknowledged that the mandatory testing requirements converted otherwise private railroads into governmental agents for purposes of the Fourth Amendment, but it suggested that the permissive testing requirements did not.  The Supreme Court disagreed.  Rather than endorsing a rigid multi-part agency test of the sort some lower courts had by that time devised, the Court seemed to follow the common law by asking simply whether "the Government's encouragement, endorsement, and participation" in the permissive testing was enough to render otherwise private railroads agents of the government for Fourth Amendment purposes.  And applying that test here there can be little doubt of the result it yields.  For the government surely "encouraged and endorsed and

> participated" in NCMEC's putative search for the same reasons it "knew of and acquiesced in" that activity: Congress funded the Center, required AOL to cooperate with it, allowed it to review Mr. Ackerman's email by excepting it from various federal criminal laws, and statutorily mandated or authorized every bit of its challenged conduct.
>
> * * * *
>
> In *Skinner*, too, the fact that the private railroads had private (economic) reasons for seeking to curb drug abuse by railroad employees—and had sought to do so before the government promulgated its regulations, was no barrier to the Court's determination that the statutory scheme converted the railroads into governmental agents.

*Ackerman*, 831 f.3d at 1302, 1303 (citations omitted). For these reasons, the Court should reject any claim that NCMEC or Microsoft is not a government agent.

V.     The private-search and third-party doctrines do not apply in this case.

Whether the private-search doctrine could apply in this case depends on disputed issues of fact, including whether Microsoft acted as a government agent and whether Microsoft employees actually viewed the images and instant messages at issue. Against these unresolved factual issues, Mr. Coyne requests that the Court accept briefing once an evidentiary hearing is conducted. Still, Mr. Coyne believes the private search doctrine is unlikely to apply for several reasons, including the following.

First, both the Tenth Circuit in *Ackerman*, 831 F.3d at 1306, and the district court in *United States v. Keith*, 980 F. Supp. 2d 33, 42 (D. Mass. 2013), have recognized that *Walter v. United States*, 447 U.S. 649 (1980), rather than *United States v. Jacobsen*, 466 U.S. 109 (1984), is the more relevant case for situations such as Mr. Coyne's. *Walter* dealt with case in which a package of films were

wrongly delivered to a company. 447 U.S. at 651. Upon opening the package, the packaging ("suggestive drawings" and "explicit descriptions of the contents") suggested that the content of the films might be obscene and law enforcement was called. *Id.* at 652. Notwithstanding the fact that a private party had intercepted the films and opened the package, the Supreme Court clearly held that law enforcement's viewing of the films without a warrant was a search that violated the Fourth Amendment. *Id.* at 655-656.

Second, the private-search doctrine articulated in *Jacobsen* relied on facts not present here. In *Jacobsen*, Federal Express employees opened a package and, upon finding a white powder, contacted the DEA. 466 U.S. at 111. The decision in *Jacobsen* ultimately relied on the fact that the later governmental inspections of the package could reveal nothing more than the existence or non-existence of the contraband (there, illegal drugs). *See, e.g., id.* at 118–119 ("Even if the white powder was not itself in 'plain view' because it was still enclosed in so many containers and covered with papers, there was a virtual certainty that nothing else of significance was in the package and that a manual inspection of the tube and its contents would not tell him anything more than he already had been told."). As now-Justice Gorsuch explained in *Ackerman*, 831 F.3d at 1305-1306, the searches at issue here could easily have revealed other content, including images and the content of the text messages.

A third and related reason is that the holding in *Jacobsen*, does not survive *United States v. Jones*, 565 U.S. 400 (2012). As the *Ackerman* Court explained,

*Jacobsen* concluded that no search had occurred because there was no reasonable expectation of privacy in concealing whether something was contraband. 831 F.3d at 1307. Yet, *Jones* explains that a court must consider both whether an individual had a reasonable expectation of privacy in the item or space and whether there was a physical intrusion or trespass on a constitutionally protected space. 565 U.S. at 406. Given this two-fold inquiry, then-Judge Gorsuch explained why it was likely that *Jacobsen* might be decided differently today:

> [W]e cannot see how we might ignore *Jones*'s potential impact on our case. And its impact here seems even clearer than in *Jacobsen*. After all, we are not dealing with a governmental drug test that destroyed but a trace amount of potential contraband. We are dealing instead with the warrantless opening and examination of (presumptively) private correspondence that could have contained much besides potential contraband for all anyone knew. And that seems pretty clearly to qualify as exactly the type of trespass to chattels that the framers sought to prevent when they adopted the Fourth Amendment.

831 F.3d at 1307.

Finally, the Supreme Court's decisions do not suggest that an individual forgoes all Fourth Amendment protections merely because the individual uses a third party to effect the communication. *Katz v. United States*, 389 U.S. 347 (1967), involved the interception of phone calls made from a public telephone booth. There, the use of a listening device installed in the telephone booth "constituted a search under the Fourth Amendment, notwithstanding the fact that the telephone company had the capacity to monitor and record the calls. In the eyes of the Court, the caller was 'surely entitled to assume that the words he utter[ed] into the mouthpiece w[ould] not be broadcast to the world.'" *United States v. Warshak*, 631

[12]

F.3d 266, 285 (6th Cir. 2010) (citations omitted); *Jones*, 565 U.S. at 418 (Sotomayor, J., concurring) ("I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection."). Even in *Jacobsen*, where the package was intercepted "pursuant to a written company policy regarding insurance claims," the Court made it clear that Fourth Amendment privacy rights do not dissipate any time a private carrier intercepts a package. 466 U.S. at 111. Instead, the Court recognized that "[l]etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." *Id.* at 114. And as already noted, *Jacobsen* turned on the fact that an individual has no expectation of privacy in concealing contraband, at least where the search will reveal nothing more than the existence or non-existence of the contraband. It is for these and other reasons that Mr. Coyne believes the third-party and private-search doctrines do not apply in this case and respectfully requests that the Court schedule a hearing so that disputed issues of fact may be resolved.

## Conclusion

For the reasons stated above, Mr. Coyne respectfully requests that the Court issue an order striking exhibits 6 and 7 to the government's opposition. Because there are disputed factual issues, Mr. Coyne also respectfully requests that the Court schedule a hearing on his motion to suppress statements and evidence.

Dated: August 14, 2017.               MICHAEL L. DESAUTELS
                                      Federal Public Defender


                                By:   */s/ Steven L. Barth*
                                      STEVEN L. BARTH
                                      Assistant Federal Public Defender

                                      */s/ Barclay T. Johnson*
                                      BARCLAY T JOHNSON
                                      Assistant Federal Public Defender

                                      Office of the Federal Public Defender
                                      126 College Street, Suite 410
                                      Burlington, Vermont  05401
                                      (802) 862-6990
                                      Counsel for James Coyne

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-cr-00154-wks-1 |
| | ) | |
| JAMES COYNE, | ) | |
| Defendant. | ) | |

CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of August, 2017, I electronically filed this DEFENDANT'S MOTION TO STRIKE and REPLY IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE AND STATEMENTS with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to the following: Gregory S. Mertz , Esq., at gmertz@mertzlawfirm.com, and Assistant United States Attorney Christina Nolan, at christina.nolan@usdoj.gov.

           MICHAEL L. DESAUTELS
           Federal Public Defender

By:   */s/ Barclay T. Johnson*
      Barclay T. Johnson

      Office of the Federal Public Defender
      District of Vermont
      126 College Street, Suite 410
      Burlington, Vermont  05401
      (802) 862-6990